# EXHIBIT 10

# Copy

# of

# US State Department Country Report UK
# 2006

11 0428
**FILED**
FEB 2 4 2011

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia



U.S. DEPARTMENT of STATE

# United Kingdom

## Country Reports on Human Rights Practices - 2006
Released by the Bureau of Democracy, Human Rights, and Labor
March 6, 2007

The United Kingdom of Great Britain and Northern Ireland, with a population of 60.6 million, is a constitutional monarchy with a democratic, parliamentary government. Citizens periodically choose their representatives in free and fair multiparty elections; a national parliamentary election took place in May 2005. The government is currently led by the Labour Party. Civilian authorities generally maintained effective control of the security forces.

The government generally respected the human rights of its citizens; the law and judiciary provide effective means of addressing individual instances of abuse. The following human rights problems were reported: increased police misconduct; occasional abuse of detainees and other persons by individual members of the police and military; overcrowded prison conditions and some inadequate prison infrastructure; increased limitations on freedom of religious expression; violence and discrimination against ethnic and religious minorities, including increased anti-Semitism, women, and children; and trafficking of persons into the country.

In Northern Ireland improved communications between loyalist and republican political leaders, the October St. Andrews Agreement establishing timetables for the reestablishment of devolved government, and continuing ceasefires by paramilitary organizations created a more stable political environment, fewer deaths from political violence, and an improved human rights environment. A decreasing number of "punishment attacks" continued in some areas under the influence of both republican and loyalist paramilitary groups.

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

The government or its agents did not commit any politically motivated killings; however, according to the Independent Police Complaints Commission (IPCC), police shot and killed five persons during the year in the performance of their duty. On June 2, the Metropolitan Police conducted a counterterrorism operation in east London, shooting and wounding suspect Muhammad Abdulkahar during the raid. An IPCC investigation determined that the shooting was an accident resulting from close contact between the officer and Abdulkahar in a very narrow space. The officer involved was not charged with a criminal or disciplinary offense.

In July 2005 members of the Metropolitan Police Service (MPS) fatally shot Jean Charles de Menezes; the shooting occurred the day after failed bombing attempts in London and two weeks after terrorist attacks that killed 56 persons. The police subsequently stated that de Menezes was not a suspect in the terrorist attacks. On July 17, the Crown Prosecution Service (CPS) determined that there was insufficient evidence to bring charges against any individual officer. However, the Metropolitan Police was expected to face charges for failing to provide for the health, safety, and welfare of the victim Lawyers for the de Menezes family have appealed to the High Court to overturn CPS's decision not to prosecute the officers involved; a decision was pending at year's end.

Hearings began in several cases involving allegations of government involvement, collusion, or culpability in three controversial killings that took place in Northern Ireland in the 1980s and 1990s. A special judicial tribunal held hearings during the year in the case of Billy Wright; however, a challenge remained pending to the decision in 2005 to hold this inquiry under the Inquiries Act of 2005. The Robert Hamill inquiry slowed due to a dispute over the request for anonymity by retired police officers who provided evidence. In November a court ruled against the special tribunal's denial of anonymity to the officers, which the special tribunal appealed. A separate inquiry into the 1989 killing of prominent human rights attorney Pat Finucane remained pending. Due to concerns that the British Inquiries Act would lead to a biased investigation, the Finucane family and human rights groups favored an independent public judicial inquiry into Finucane's murder.



During the year there was one high-profile killing by unknown persons. On November 23, former Russian intelligence officer Aleksandr Litvinenko died in London as a result of radioactive poisoning by polonium 210 (a highly restricted substance) by unknown actors. At year's end, investigations into the death continued in both the country and Russia..There were no allegations that the government was implicated or complicit in the killing

During the year there were some developments in killings for which paramilitary forces appeared to be responsible. On December 19, an inquest took place into the 2001 murder of journalist Martin O'Hagan who was investigating criminal activities by a loyalist paramilitary group. At the inquest, a police inspector stated that O'Hagan's murder was still under investigation but that he believed the police knew who was responsible.

The Independent Monitoring Commission (IMC) reported that loyalist paramilitary groups were thought to be responsible for two killings in Northern Ireland between September 2005 and August during the year. The IMC was unable to place blame in three other killings, including the April murder of Sinn Fein member Denis Donaldson, who admitted publicly in December 2005 to having been a British spy. The IMC, however, continued to monitor developments in the Donaldson and other cases.

In October the IMC reported that the Provisional Irish Republican Army had committed itself to following "a peaceful path."

In September authorities opened court-martial proceedings against seven soldiers, including a high ranking officer, on charges of mistreating Iraqi detainees and for the death of an Iraqi civilian, Baha Musa, in 2003. The hearings continued at year's end. In 2005 four soldiers were convicted and dismissed from the army in relation to abuse of Iraqis in their custody.

b. Disappearance

There were no reports of politically motivated disappearances.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

Although the law prohibits such practices, there were complaints that individual members of the police occasionally abused detainees.

In December 2005 the House of Lords Judicial Committee reversed an appeals court decision and ruled that even in terrorism cases no court could consider evidence obtained through torture.

In November Human Rights Watch published a briefing paper, Dangerous Ambivalence: UK Policy on Torture since 9/11, accusing the government of actively undermining the global ban on torture. The report was critical of the government's efforts to deport terrorism suspects to countries where the suspects might be at risk of torture or death. The government has memoranda of understanding with Jordan and Libya to return terrorism suspects on the condition that returnees will not be tortured, verified by post transfer, independent monitoring conducted by local NGOs. The report also criticized the government's appeal to the European Court of Human Rights to set aside judgments affirming the absolute ban on torture.

During the year the Special Immigration Appeals Commission, an immigration court, denied the appeal of an Algerian man against deportation to Algeria; the man alleged that he would face torture if returned because he had been tortured there previously. Although there were reports of Algerian security forces using torture, the government concluded, based on commitments in an exchange of letters with the Algerian government, that the Algerian authorities would not abuse Algerian citizens that the British government deported or who voluntarily returned to Algeria. The government offered individuals returning to Algeria regular contact with its embassy to ensure they had means to communicate to the government on their condition and treatment upon return to Algeria.

During the year six Algerian terrorism suspects voluntarily left the country and returned to Algeria in accordance with the exchange of letters. The individuals who voluntarily left the country to return to Algeria were offered the assistance of the British government, including through regularly scheduled contact with embassy officials, either at the instigation of the individual or of the embassy, whichever the returnee preferred. None were reported to have experienced abuse by Algerian authorities at year's end.

The IMC reported that there was a marked reduction in "punishment attacks" and intimidation in areas under the influence of both loyalist and republican paramilitary groups in Northern Ireland, although the practice continued. The IMC recorded a 44 percent reduction in shootings and assaults with casualties attributed to paramilitary groups. For the period September 2005 to August, 109 shootings and assaults attributed to paramilitary groups took place. Twenty-one of these were carried out by Republican groups and 88 by Loyalists. This compared to a total of 193 such incidents between September 2004 and August 2005, of which 52 were attributed to Republican groups and 41 to Loyalists



Prison and Detention Center Conditions

Prison conditions generally met international standards, and the government permitted visits by independent human rights observers. However, overcrowding and poor facilities were problems, and suicides occurred. In October the Prison Service reported there were 79,843 prisoners in England and Wales, an increase of 2,069 over a one-year period. Prison governors warned that jails were at a "bursting point" and that only 125 more spaces were available. Widespread press coverage prompted Home Secretary John Reid to announce corrective measures, including freeing up hundreds of local police cells for use, using women's prisons to house male inmates, and a controversial plan to pay prisoners from outside Europe a package of up to $5,000 (2,500 pounds) to leave the country. The lord chief justice, Lord Phillips, also called for courts to make more use of community service sentences; his proposal was subsequently endorsed by the Home Office.

During the year the daily average of prisoners in Scotland was 6,857, slightly less than in 2005. In previous years hundreds of prisoners in Scottish prisons sued the Scottish Executive over conditions that did not meet European Union standards, particularly the lack of plumbing in individual cells. In 2005 "slopping out", which is used in lieu of toilets, was ended at Her Majesty's Prisons (HMP) Perth and Edinburgh; however, the practice continued at HMP Young Offenders Institute in Polmont and HMP Peterhead.

According to its annual report covering April 2005 through March, the Prison and Parole Ombudsman for England and Wales investigated 368 prisoner complaints, approximately half of which were upheld. According to the report, there were also 197 fatalities of individuals in police custody in England and Wales, of which 94 were due to natural causes and 83 self-inflicted. An additional 131 prisoners were resuscitated after serious self-harm incidents. A 2005 Prison Reform Trust report stated that the institutions with the highest number of suicides were generally the most overcrowded and that nearly two-thirds of those who committed suicide in prison had a history of drug abuse.

In Scotland eight prisoners committed suicide between April 2005 and March. There were a total of 24 deaths of persons in custody during this time frame due to a variety of causes, including poor health, accidents in the course of employment, and drug overdose.

The government permitted independent human rights observers and the media to visit prisons and immigration detention centers. During the year the Council of Europe's Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment (CPT) published reports on its two visits to the country in 2005, along with the government's responses. The reports contained a number of recommendations, including that the government remind police to avoid unnecessary force during arrests, always bring a detainee physically before the judge responsible for deciding whether to extend that individual's detention, and amend the law to ensure that all persons arrested have the right of access to a lawyer from the beginning of their arrest. The CPT also made recommendations on the use of diplomatic assurances in memoranda of understanding prior to deportations to countries where there is a risk of torture.

d. Arbitrary Arrest or Detention

The law prohibits arbitrary arrest and detention, and the government generally observed these prohibitions.

Role of the Police and Security Apparatus

In Great Britain regional police forces (43 in England and Wales and 8 in Scotland) are responsible for maintaining law and order. In Northern Ireland the PSNI has that responsibility. On April 1, the government created the Serious Organized Crime Agency (SOCA) by amalgamating several previous agencies. SOCA is tasked with fighting organized crime throughout England and Wales. The Independent Police Complaints Commission (IPCC) is responsible for effectively dealing with complaints against the police, setting standards for how the police handle complaints, and assisting police forces with making improvements. The police Oobudsman for Northern Ireland has the same role. There currently is no independent police ombudsman in Scotland to investigate complaints against police forces. Complaints in Scotland are investigated by the police station where an incident occurs.

According to the IPCC, from April 2005 until March there were a total of 26,268 public complaints lodged against police in England and Wales. This was an increase of 15 percent from the previous reporting period. Complaints ranged from improper behavior, inappropriate language, or lack of action by someone serving with the police. During the same period in Northern Ireland, the police ombudsman received 3,192 complaints that involved 5,381 allegations of police misconduct, an increase of 23 percent from the previous year. A total of 169 of these complaints were ultimately referred to the public prosecution service, of which only five contained recommendations for prosecution. The police ombudsman and the police service of Northern Ireland credited this increase to enhanced expectations by the public in the police and increased police engagement in areas historically unreceptive to police service.

Arrest and Detention

Police officers generally may arrest persons only if they have reasonable grounds for suspecting that someone has committed or is about to commit one or more listed "arrestable offenses." Even if the crime in question is not an arrestable offense, a police officer may arrest a person without a warrant, provided the officer believes the arrest is necessary to prevent damage to property or physical injury. The law provides for certain exceptions related to terrorism, particularly in Northern Ireland.

The law limits the amount of time that a suspect can be detained without a formal charge for a criminal offense, generally to less than 24 hours, but up to four days in cases of rape, murder, and complex fraud. The law also requires that an inspector review the detention at set intervals to ensure that it is necessary and lawful. The law provides for the government to promptly inform suspects of the criminal offenses for which they are being investigated.

On March 30, the Terrorism Act of 2006 was enacted, allowing the police to detain terrorism suspects for up to 28 days before formally charging them. The government used this law to detain 17 suspects following the August terror plot to highjack commercial aircraft and blow them up over foreign cities.

Defendants awaiting trial have a statutory right to bail except when there is a risk that they would flee, commit another offense, or in other limited circumstances. Detainees are allowed to make telephone calls and have legal representation, including state-provided counsel if indigent.

The law permits extended detention of foreigners suspected of being terrorists, but who cannot be removed from the country immediately due to concerns that they will be subjected to torture or the death penalty in their country of origin. Such detainees have the right to appeal their certification by the government as terror suspects. The government concluded memoranda of understanding with some countries to permit the return of suspected terrorists to their countries of origin and was seeking similar agreements with others, despite NGO concerns with the human rights records of those countries (see section 1.c.).

The Prevention of Terrorism Act of 2005 permits a judge (or the home secretary with a judge's permission) to impose "control orders" on individuals suspected of involvement in terrorism-related activities, regardless of nationality or perceived terrorist cause. The control orders include a range of restrictions up to house arrest. In April a high court judge declared that Section 3 of the act was incompatible with the right to a fair trial according to the European Convention on Human Rights.

e. Denial of Fair Public Trial

The law provides for an independent judiciary, and the government generally respected judicial independence in practice.

There are several levels of courts. In England and Wales, most criminal cases are heard by magistrates' courts, which were managed by locally-based committees. Their decisions may be appealed to one of 90 crown courts, which also hear criminal cases requiring a jury trial, or to the high courts. Crown court convictions may be appealed to the Court of Appeal, which may in turn refer cases involving points of law to the Lords of Appeal in Ordinary (the Law Lords), who constitute the country's final court of appeal. The Criminal Cases Review Commission is an additional appellate body in England, Wales, and Northern Ireland and considers cases after the judicial appeals process is exhausted, but where significant new evidence casts doubt on the conviction.

In Scotland the High Court of Justiciary acts as a court of first instance for serious crimes, such as rape and murder, and also serves as an appellate body. There are 49 sheriff courts, which handle lesser crimes. District courts in each local authority handle crimes such as breach of peace, minor assaults, and petty theft Civil matters can be handled in the first instance by either the Court of Session, which is the supreme civil court in Scotland, or by sheriff courts. Decisions by the Court of Session can be appealed to the Law Lords.

Trial Procedures

The law provides for the right to a fair trial, and an independent judiciary generally enforced this right.

The law allows for jury trials, except in England and Wales when the jury has been intimidated, when "compelling new evidence" arises after a previous acquittal, or when evidence of a defendant's previous misconduct is to be introduced. In Northern Ireland trials for certain terrorism-related crimes also do not allow juries in what are known as "Diplock courts." In December Parliament passed legislation that would abolish these courts in July 2007, however judge-only trials would continue in exceptional cases where juries could be intimidated.

Criminal proceedings must be held in public except those in juvenile court and those involving public decency or security. In a

trial under the Official Secrets Act, the judge may order the court closed, but sentencing must be public

Defendants have the right to be present and consult with an attorney in a timely manner and to question witnesses against them. Defendants have access to government-held evidence relevant to their cases through a process of Common Law disclosure except in certain circumstances including the damaging of defense witness credibility, claims of public interest immunity, and material which falls under statutory exceptions such as national security.

Defendants have the right to appeal to successively higher courts, they also enjoy a presumption of innocence until proven guilty. Indigent defendants have the right to free counsel of their choice, with some exceptions.

Political Prisoners and Detainees

There were no reports of political prisoners or detainees.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law prohibits such actions, and the government generally respected these prohibitions in practice.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The law provides for freedom of speech and of the press, and the government generally respected these rights in practice. An independent press, an effective judiciary, and a functioning democratic political system combined to ensure freedom of speech and of the press.

Internet Freedom

There were no government restrictions on access to the Internet. Individuals and groups could engage in the peaceful expression of views via the Internet, including by electronic mail. The law permits communications data surveillance, to include Internet usage, in the interests of national security, to prevent or detect a crime, and in the interests of public safety. The use of surveillance requires the approval of the secretary of state. Interception warrants are overseen by an independent interception of communications commissioner and public complaints of surveillance abuses are investigated by the Investigatory Powers Tribunal.

The Internet was widely available throughout the country and was available at no cost in public libraries. Approximately 62 percent of the population used the Internet according to European Union statistics.

Academic Freedom and Cultural Events

There were no government restrictions on academic freedom or cultural events

Referring to boycotts of academics working in Israel called by two teachers' associations, a parliamentary report on anti-Semitism concluded that such efforts were "an assault on academic freedom and intellectual exchange" (see section 2.c.).

b. Freedom of Peaceful Assembly and Association

Freedom of Assembly

The law provides for freedom of assembly and the government generally respected this right in practice.

In Northern Ireland residents in some Catholic communities perceived certain parades by protestant loyalist groups to be threatening or provocative. The law grants responsibility for ruling on "contentious" marches to a parades commission, which may not ban marches but may impose conditions such as route restrictions. Due to efforts within the communities and coordination with the police service, the July loyalist parade marching season was considered the most peaceful and trouble free in many years.

Freedom of Association



The law provides for freedom of association and the government generally respected this right in practice

c. Freedom of Religion

The law provides for freedom of religion, and the government generally respected this right in practice.

On February 16, the government enacted the Racial and Religious Hatred Act and the Equality Act applicable throughout Great Britain. The Racial and Religious Hatred Act amended a previous law by creating new offenses for stirring up hatred against persons on religious grounds. The Equality Act made it illegal to discriminate on the grounds of "religion or belief" or the "lack of religion or belief" in the provision of goods, facilities and services, education, the use and disposal of property, and the exercise of public functions.

In February Muslim cleric Abu Hamza al-Masri was sentenced to seven years on six charges of soliciting others to murder Jews and non-Muslims, 21 months on three charges of incitement to racial hatred, three years for possessing "threatening, abusive or insulting recordings," and three and one-half years for having a document useful to terrorists. The sentences were to run concurrently.

There are two established (or state) churches, the Church of England (Anglican) and the Church of Scotland (Presbyterian). The monarch is the "supreme governor" of the Church of England and always must be a member of the church and promise to uphold it. Two Anglican archbishops and 24 bishops receive automatic membership in the House of Lords but clergy from other faiths are not automatically granted this privilege. The archbishops of Canterbury and York on retirement are also offered life peerages. Clergy of other faiths are not automatically granted these privileges.

The government does not require religious groups to be recognized officially, registered, or licensed. However, the government does not consider the Church of Scientology and the Unification Church as religions for the purpose of visas for ministers of religion or missionaries. In 2005 the Home Office lifted a long-standing ban on Unification Church leader Reverend Sun Myung Moon from entering the country. Reverend Moon was granted a visa limited to attendance at a one-day conference in November 2005. According to the department of communities and local government, the government asserts the right to exclude individuals from the country on the grounds that their presence is not conducive to the public good, even where the public expression of religious or other beliefs by that individual is part of the reason for exclusion. The term "public good" is not defined in this context by the government.

The law requires religious education in publicly maintained schools throughout the country. The content of religious instruction is decided on a local basis and must be nondenominational and refrain from attempting to convert pupils. All parents have the right to withdraw a child from religious education, but the school must approve this request.

Schools in England and Wales also must provide a daily act of collective worship, which may be waived if a school's administration deems it inappropriate for some or all of the students. Under some circumstances, non-Christian worship may be allowed.

While most state-supported schools were Protestant or Roman Catholic, there were 36 Jewish, four Muslim, two Sikh, one Greek Orthodox, and one Seventh-day Adventist state-supported schools. Other Christian denominations accounted for 115 of the schools.

Societal Abuses and Discrimination

According to the Home Office, the police recorded 50,000 racially or religiously motivated hate crimes during 2005. The British Crime Survey (BCS), which is based on interviews with a wide sample of persons and includes crimes that are not reported to police, indicated that there were 260,000 such offences in 2005. The metropolitan police alone reported 11,799 incidents of racist and religious hate crime.

In March the Law Lords, the court of last resort, ruled in favor of a high school in Luton that expelled a Muslim teenager, Shabina Begum, for contravening its dress code. In 2002 the school had expelled her for wearing a jilbab, a traditional dress that leaves only the face and hands exposed, which violated the school's dress code. The school, which was 79 percent Muslim and had a Muslim headmaster, created the policy after consultation with local Muslim organizations. Ms. Begum was considering appealing the case to the ECHR.

A Muslim teaching assistant was fired in October for insisting on wearing a veil in a language class when adult males were present in the classroom. The incident was widely covered in the press, stimulating much public discussion in the wider community about Muslim integration and statements from government officials. Then Foreign Minister Jack Straw reported that he asked veiled women to remove their veils in his office when talking to him and Prime Minister Tony Blair indicated that



although he considered the veiling of Muslim women in British society to be inappropriate (anti social), he would not support compelling veil removal by law.

In October British Airways banned an employee for openly wearing a small Christian cross necklace. When she refused to remove or cover up the cross the airline sent her home on unpaid leave. The airline allowed Muslims and Sikhs to wear the veil and turbans but did not allow employees to wear any jewelry. Christians claimed the airline's policy was discriminatory on religious grounds and set a double standard.

The Muslim community continued to criticize police use of "stop and search" powers, as well as the 28-day detention powers for terrorism suspects. On May 18, the Islamic Human Rights Commission published a survey of Muslims in the country. Respondents generally perceived the country's antiterror laws as unfair towards Muslims and society as lacking respect for Muslims. The report indicated, however, that the majority of respondents supported British laws.

The Muslim community was subject to an increased number of anti-Muslim incidents following the July 2005 bombings of London's transport system. The bombings, carried out by Muslims, created a backlash against Muslims in the form of verbal and physical assaults, vandalism, arson, anti-Muslim literature, and Internet postings. Hindus and Sikhs, misidentified as Muslims, were also targets. The government publicly encouraged citizens to show restraint and established intercommunal forums to foster dialogue between communities.

During the year government and NGO reports indicated that anti-Semitism had been on the rise since 2000 and was not restricted to the margins of society. There were approximately 300,000 Jews living in the country, with two-thirds of the Jewish community living in London and 10 percent living in Manchester.

The Community Security Trust's (CST) Anti-Semitic Incidents Report 2006 reported 594 anti-Semitic hate incidents throughout the country during the year. This was a 31 percent increase from the 455 incidents recorded in 2005, and was the highest total since records began in 1984. The total included 112 violent assaults (up 37 percent from 2005); 365 incidents of abusive behavior (up 34 percent from 2005); 27 threats (up 8 percent from 2005); and 70 incidents of damage and desecration of Jewish communal property (up 46 percent from 2005). According to the CST, July and August had the highest number of incidents which were most likely triggered by the conflict involving Israel and Lebanon during those months.

In August a 12-year-old Jewish school girl boarding a bus was assaulted by a group of her fellow male and female students; before being beaten into unconsciousness and robbed by them, she was asked whether she was "English or Jewish."

In September the All-Party Parliamentary Inquiry into Anti-Semitism released a comprehensive report on the status of anti-Semitism in the country, identified deficiencies in the government's approach to dealing with the problem, and offered recommendations to government. The report concluded that anti-Semitism was on the rise, with one leader of the community saying that "there is probably a greater feeling of discomfort, greater concerns, greater fears now about anti-Semitism than there have been for many decades." The report also noted that the Jewish community "has had to provide security guards for synagogues, Jewish schools, buildings and events...costing the community millions of pounds annually." The report also noted that an extremely small number of police forces recorded anti-Semitic incidents as such and that the government's annual Racist Incident Monitoring Report did not break down racist crime into smaller subcategories. The report also expressed concern that only one in ten incidents reported to the police resulted in any proceedings against the perpetrator.

The All-Party Parliamentary Inquiry also noted concern over anti-Semitism on university campuses. The Union of Jewish Students, in its testimony, noted that Jewish students "have become increasingly alarmed by virulent and unbalanced attacks on the state of Israel and the failure of student bodies and organizations to clearly and forcefully condemn anti-Semitism when it occurs." A lecturer at a public London university told a Jewish student who sought to explain his absence on religious festivals that he should choose between his religion or his degree. Another Jewish student was told that since her university is a secular institution it does not need to take any account of a student's religion and that since she refused to take exams on the Jewish Sabbath, the university would think twice about enrolling anyone with a Jewish name in the future.

In May the National Association of Teachers in Further and Higher Education (NATFHE), the largest higher education union, passed a motion at its annual conference for all members to boycott all Israeli academics. In 2005 the Association of University Teachers passed a motion boycotting Israel's Haifa and Bar Ilan universities at its annual conference. These academic boycotts have not been suggested against other countries. A report by the All-Party Parliamentary Inquiry into Anti-Semitism released on September 7 concluded that such actions were "an assault on academic freedom and intellectual exchange." Witnesses for the report also noted that the debate moved beyond criticism into anti-Semitic demonizing of Israel; contained Nazi analogies and suggestions that Israel was "a fascist state," described a Jewish group as a Zionist operation, and asserted that "campus Jews" who turned out to block the boycott were not "proper trade unionists."

In October the High Court upheld an appeal by the mayor of London, Ken Livingston, to overturn a month-long suspension he received for bringing his office into disrepute when he likened a Jewish reporter to a Nazi concentration camp guard. The court's

 

Justice Collins noted that the mayor should have apologized and realized his comments not only offended the journalist but was "likely to be regarded as an entirely inappropriate observation by Jews in general." The Anti-Defamation League and other NGOs noted that the mayor had a history of making anti-Semitic remarks.

In 2004 a public secondary school in Horsham banned a group of teenage Christians from wearing "purity rings." The rings were inscribed with a biblical verse and worn as a symbol of their belief in chastity until marriage. Several students were punished with detentions and taught in isolation from other students for wearing the rings. The school claimed the rings violated its strict uniform code. Muslims and Sikh students, however, were allowed to wear headscarves or kara bracelets as a means of religious expression. Christians continued to complain that the policy is discriminatory and permitted a double standard, and they argued that the punishment of teaching in isolation had a detrimental effect on students' education. At year's end some parents and students were considering legal action.

For a more detailed discussion, see the 2006 International Religious Freedom Report.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

The law provides for these rights, and the government generally respected them in practice.

Although there is no law prohibiting exile, the government did not employ it.

Protection of Refugees

The laws provide for the granting of asylum or refugee status in accordance with the 1951 UN Convention relating to the Status of Refugees and its 1967 protocol, and the government has established a system for providing protection to refugees. In practice the government provided protection against refoulement, the return of persons to a country where they feared persecution; however, the government limited this right for persons from "safe countries of origin." The government granted refugee status or asylum.

The government also provided temporary protection to individuals who may not qualify as refugees under the 1951 convention and its 1967 protocol. In 2005 approximately 3,085 persons were not recognized as refugees but were granted permission to remain in the country.

The government cooperated with the Office of the UN High Commissioner for Refugees and other humanitarian organizations in assisting refugees and asylum seekers.

The law authorizes the home secretary to institute a list of safe countries of origin (or safe regions of certain countries) for all residents or for particular classes of persons. The government considered asylum claims from such individuals as unfounded.

The law also casts doubt on the credibility of applicants who claim asylum in the country after having passed through a safe country of transit. Furthermore, the law permits asylum seekers to be removed to a third country deemed responsible for adjudicating an applicant's claim.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The law provides citizens with the right to change their government peacefully, and citizens exercised this right in practice through periodic, free, and fair elections held on the basis of universal suffrage.

Elections and Political Participation

The government is formed on the basis of a majority of seats in the House of Commons, which are contested in elections held at least every five years; elections for members of Parliament took place in May 2005. The government appoints the other chamber of Parliament, the House of Lords. Participation in the political process is open to all persons and parties. Other elected bodies, such as the Scottish Parliament and the Welsh Assembly, control matters of regional importance, such as education, health, and some economic matters.

The overseas territories, with an aggregate population of approximately 212,000, have varying degrees of self-government based on the United Kingdom model, with appointed governors.

There were 126 women in the 646-seat House of Commons and 142 in the 736-seat House of Lords. There were eight women

 

in the 23-member cabinet, and 30 women held ministerial posts (23 from the House of Commons and seven from the House of Lords). There was one woman among the 12 Law Lords There were 15 members of ethnic minorities in the House of Commons, 24 in the House of Lords, and one in the cabinet

Government Corruption and Transparency

During the year allegations surfaced that "life peerages" and other honors were offered to individuals in return for large donations or loans to some political parties in what the press termed the "loans for peerage" scandal. Life peerages grant all the privileges of hereditary peerage, including a seat in the House of Lords, except that it cannot be passed to the recipient's children. The existence of the loans emerged after the Lords Appointments Commission, an independent watchdog that reviews party nominations for new peers, raised concerns about some of the individuals nominated during their vetting process. Some nominees later withdrew their nominations following a public outcry. Police were conducting an ever-widening investigation at year's end, although detectives had not charged anyone with a crime.

The law allows for public access to information held by public authorities. Anyone can request information, regardless of age, nationality, or location. There was a mechanism to appeal denials. However, in October the lord chancellor, Lord Falconer, proposed limiting the number of freedom of information requests that opposition politicians, campaign groups, and journalists could submit to the government. Under the proposals, requests for sensitive and controversial information would also be likely to be refused. Lord Falconer claimed that the proposals might lower the costs of researching each request and free up a government minister's time.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

A variety of domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases. Government officials often were cooperative and responsive to their views.

In December the government arrested Vincent Bajinya, Charles Munyaneza, Celestin Ugirashebuja, and Emmanuel Nteziryayo after they were accused by the government of Rwanda in an extradition warrant of murdering, and aiding and abetting the killing of Tutsis in 1994. The government also cancelled the refugee status of Ugirashebuja and Munyaneza.

Section 5 Discrimination, Societal Abuses, and Trafficking in Persons

The law prohibits discrimination based on race, nationality, gender, sexual orientation, or disability; however, some groups continued to experience societal discrimination.

Women

The law prohibits domestic violence, including spousal abuse, and the government strictly enforced the law with penalties ranging up to life imprisonment. Nonetheless, violence against women continued to be a problem. According to the British Crime Survey (BCS), there were 1,210 indecent assaults on females and 21,816 sexual assaults on females between 2005 and 2006. The law provides for injunctive relief, personal protection orders, and protective exclusion orders (similar to restraining orders) for women who are victims of violence.

Between 2005 and 2006, police in Scotland recorded 45,796 incidents of domestic abuse. Incidents with a female victim and male perpetrator represented 87 percent of the cases. Of the incidents, 52 percent led to the filing of charges for at least one crime or offence.

The law, which was enforced strictly, criminalizes rape, including spousal rape, and provides substantial penalties ranging up to life imprisonment. From April 2005 through March, BCS recorded 13,331 rapes of women. The government provided shelters, counseling, and other assistance for victims of battery or rape and offered free legal aid to battered women who were economically reliant on their abusers.

Female genital mutilation (FGM) is illegal in England, Wales, Northern Ireland, and Scotland. The maximum penalty for aiding, abetting, counseling, procuring, or carrying out this practice is 14 years' imprisonment. FGM was most often practiced by immigrant or refugee groups on girls ages seven to nine from Eritrea, Ethiopia, Somalia, and Yemen. The Department of Health estimated approximately 74,000 women in the country had undergone FGM. In July the Metropolitan Police Service and a number of NGOs launched an awareness and prevention campaign focused on this issue.

Police and NGOs estimated that approximately 12 "honor killings" occurred each year, although no formal statistics are kept.

The International Campaign Against Honor Killings estimated that the number of women in the country seeking help from their organization quadrupled since 2005. NGOs raised concerns that police needed more training to identify and respond to potential cases when women seek police protection. In August a court sentenced Azhar Nazir and his cousin Imran Mohammed to life imprisonment for strangling Nazir's sister, Samaira Nazir, stabbing her 18 times, and cutting her throat in front of her two nieces. The "honor killing" occurred because the victim rejected a marriage her Pakistani family arranged and was in a relationship with an Afghan asylum seeker.

While prostitution involving consenting adults is legal, the law prohibits offenses such as loitering for the purpose of prostitution and maintaining a brothel. Government and NGOs estimated that there were 100,000 prostitutes in the country. Organized international gangs continued to traffic women into the country for exploitation in the sex industry (see section 5, Trafficking). The law also prohibits child sex tourism and allows authorities to prosecute citizens or residents for offenses committed abroad.

The law prohibits sexual harassment and provides penalties of up to five years' imprisonment for sexual harassment in public or in the workplace.

Although women enjoy the same rights as men, including rights under family and property law and in the judicial system, in practice women experienced some discrimination. According to a December 2005 Equal Opportunities Commission report, women's average hourly earnings for full-time, private sector employment were 22.5 percent lower than those of men; in full-time public sector jobs, women earned 13.3 percent less than men.

There is a cabinet-level minister for women, a deputy minister for women and equality, and two independent bodies for women's issues: the Equal Opportunities Commission (EOC) and Women's National Commission (WNC). The EOC supported women in discrimination cases before industrial tribunals and courts and produced guidelines for employers. The WNC is an umbrella organization representing women and women's organizations which seeks to ensure that the government takes women's views into account and that women participate in public debate.

Children

The government was strongly committed to children's rights and welfare. The government provided free, universal, and compulsory education until age 16 and further free education until age 18. The most recent UN Educational, Scientific, and Cultural Organization statistics from 2004 recorded 100 percent enrollment of children of primary school age and over 90 percent for those of secondary school age.

The government amply funded medical care for children.

Child abuse remained a problem. Several NGOs and charities, the most prominent of which was the National Society for the Prevention of Cruelty to Children, campaigned against child abuse and neglect. According to the organization, 6 percent of children experience frequent and severe emotional maltreatment during childhood, 18 percent of children experience some absence of care, more than 25 percent of all rapes recorded by the police are committed against children under age 16, and 31 percent of children experience bullying during childhood.

The minister for children coordinated government policy concerning children and young persons in England and Wales. In Scotland the ministries for education, young people, and communities supervised similar programs designed to protect and provide assistance to minors. In 2005 the government appointed a commissioner for children in Northern Ireland.

During the year children were subjected to forced labor or trafficked in the country for sexual exploitation (see section 5, Trafficking). In October Parliament's Joint Committee on Human Rights issued a report on human trafficking calling child trafficking "one of the most serious human rights issues in the modern world." The report also made recommendations for government to increase the level of protection to children being trafficked.

The armed forces accept recruits from age 16, although they are not deployed on operations until age 18.

Trafficking in Persons

Although prohibited by law, trafficking in persons, particularly for sexual exploitation, remained a problem.

The country was primarily a destination for trafficked persons and occasionally a transit point. There was no comprehensive official estimate of the number of victims of trafficking or the annual number of persons trafficked into the country.

Women were trafficked for sexual exploitation from Central and Eastern Europe (primarily the Balkans and the former Soviet



Union) and Asia, including China While many or most trafficked women worked in the sex industry, women, men, and children were also trafficked for labor exploitation in domestic service, agricultural and rural labor, construction, and catering

Trafficking victims were most often subject to debt bondage, the withholding of travel documents, false information about law enforcement and immigration penalties, or threats of violence against them or their families Traffickers less frequently employed physical and sexual violence.

Organized international gangs allegedly were responsible for most trafficking for commercial sexual exploitation.

The law prohibits trafficking in persons for the purposes of prostitution, sexual exploitation, or forced labor. The law criminalizes trafficking offenses by citizens and residents, whether committed domestically or abroad, and carries a maximum sentence of 14 years' imprisonment. The law also prohibits such related acts as keeping a brothel and causing, inciting, or controlling prostitution for gain. There were severe penalties for such offenses as causing, inciting, controlling, arranging, or facilitating the prostitution of a child. The law also criminalizes paying for sexual services of a child, as well as travel abroad for the purpose of obtaining sexual services from children.

The "Reflex" task force, which brought together agencies that combat trafficking in persons, funded an MPS program targeting organized immigration crime in London. Operation Pentameter, which ran from February to May in every police jurisdiction in the country, initiated an effort to determine the scope of the off-street prostitution market. Despite the limited scope of the operation--it did not address street-level prostitution or trafficking for labor--it succeeded in raising awareness within both the general public and specific ethnic communities of the extent and effect of trafficking in persons for the sex industry. In the course of the operation, law enforcement officials recovered 84 victims, including 12 children. As a result of the operation, 134 persons were charged in relation to management of brothels, trafficking, and related offences.

The Home Office, which includes the Immigration and Nationality Directorate, had the lead in efforts to combat trafficking. Other cabinet-level departments involved in antitrafficking efforts include the Foreign and Commonwealth Office, the Department of Trade and Industry, the Department for Education and Skills, the Crown Prosecution Service, and the Department for International Finance and Development. In April the government created the Serious and Organized Crime Agency, which handles investigations of organized immigration crime nationally, including trafficking.

The government assisted with international investigations of trafficking.

Several NGOs criticized the government for not "opting in" on the European Council directive on providing "reflection periods" by issuing short-term residence permits for victims of trafficking who cooperate with the authorities. However, the government considered each instance on a case-by-case basis. Victims were able to make claims for asylum or humanitarian protection. In many cases the government also granted "exceptional leave to remain," thereby permitting victims to obtain government benefits, including housing, education, and health care. The government did not prosecute victims of trafficking who were violating prostitution or immigration laws; however, they could face repatriation to their country of origin.

Local social services authorities and various charities provided services to trafficking victims. A program run by the Poppy Project received government funding to initiate a national 24-hour outreach service. In addition to operating a shelter with capacity to support 25 trafficking victims in the immediate stages after they have left prostitution, the program created 10 new step-down places, enabling women to gradually gain their independence; provided information and advice for victims and law enforcement personnel; and funded a specialist team of four outreach workers to work alongside law enforcement agencies and immigration to identify and assist trafficked women to escape prostitution. Children who may be victims of trafficking are the responsibility of local social service agencies and were generally placed in the foster care system. The government and the NGO community maintained an active dialogue on victim protection services.

The Foreign and Commonwealth Office and the Department for International Development distributed antitrafficking material in countries of origin. Immigration intelligence assets were deployed across Europe on the main routes for illegal migration and trafficking under the Immigration Liaison Officer program. The National Criminal Intelligence Service engaged in exchange programs in which its officers aided in preventive antitrafficking efforts in Central and Eastern Europe. On October 3, the country launched the UK Human Trafficking Centre, which has a mandate to coordinate national activity against traffickers for sexual and nonsexual exploitation, both prevention and prosecution; train and inform police officers on trafficking and victim-related matters; act as a point of contact for NGOs and foreign law enforcement; and develop "best practices" in antitrafficking areas.

Persons with Disabilities

The law prohibits discrimination against persons with disabilities in employment, education, access to health care, or in the provision of other state services. The law also mandates access to buildings for persons with disabilities, and the government effectively enforced these provisions in practice